P. W. ROBBINS et al., Appellants, v. J. E. DANIEL et al., Appellees.

No. 44574.

MARCH 15, 1939.

REHEARING DENIED JUNE 23, 1939.

S. B. Allen and E. K. Jones, for appellants.

O. M. Slaymaker, R. E. Killmar, and D. D. Slaymaker, for appellees.

Bliss, J.—Ada O. Daniel died intestate and spouseless, on May 17, 1936, leaving the plaintiffs and the defendant J. E. Daniel as her only heirs at law. The other defendant, O. B. Monroe, was the administrator of her estate. The plaintiffs are grandchildren or great grandchildren of the decedent, and J. E. Daniel was her only remaining child. Since O. B. Monroe, the administrator, was made defendant only because he would not join with the plaintiffs, we will refer to him as the administrator and to J. E. Daniel as the defendant.

Ada O. Daniel was almost ninety-four years old at her death. Her husband had preceded her in death many years. She had three sons and one daughter. The latter who was the mother of the plaintiff, P. W. Robbins, died in 1893. The son Charles died in 1919, and the son Kenneth died on September 20, 1924. She and her husband were pioneer farmers in Clarke county, but, after his death, she spent her remaining years in a modest home in Osceola. Her son Kenneth made his home with her for some years before his death, in 1924. For two or three years she lived alone, but, in 1926 or 1927, the defendant came to live with her, and continued to do so until her death. On January 13, 1932, the defendant's son Jefferson Daniel and his wife also moved into the grandmother's home and remained until her death. In addition to her home, she owned about four hundred and twenty acres of land. Most of it was poor land, and the administrator, in his inventory, estimated its value at $13,000. It was unincumbered. At her death she owned this farm land, about $800 in notes, and nothing more, and owed debts of about $500.

After her husband's death, her brother A. P. Jenks, a member of the private bank, known as Simmons and Company Bank, of Osceola, advised her some in business matters. Jenks was wealthy, and at his death, Mrs. Daniel received considerable money from his estate. She did her banking business at the

Simmons bank, and made both demand and time deposits therein. Commencing in January 1924, approximately eighteen or twenty thousand dollars went through her accounts in this bank, up to the time it closed on December 9, 1930. Items of deposit and withdrawal in her account, for a considerable part of this time were put in evidence. At times money would be transferred from her checking account to time deposits. At other times money was withdrawn and loaned to different individuals.

On March 1, 1926, she loaned $12,000 to A. F. Switzer and wife, for which they gave to Mrs. Daniel their note for that amount, payable March 1, 1931, with interest at five per cent, and their real estate mortgage as security. When the bank closed she had $6,500 on time deposit and $500 on demand deposit. The record does not disclose what she realized on these deposit claims.

On March 14, 1928, an assignment of that date, of the Switzer mortgage to the defendant, bearing the name of Ada O. Daniel, as assignor, was filed and recorded in the Lucas county recorder's office. On the same day the $12,000 note was indorsed to the defendant. The indorsement over her name was in the handwriting of W. M. Temple, a lawyer of Osceola. The acknowledgment of the execution of the assignment was before him. In 1928 the defendant collected the mortgage indebtedness, less a discount.

On May 16, 1933, a deed was filed for record with the recorder purporting to have been executed and acknowledged, on January 23, 1933, by Ada O. Daniel, before O. M. Slaymaker, notary public, conveying to the defendant her home in Osceola.

Application was made for the appointment of O. B. Monroe as administrator of his mother's estate, by the defendant on the day following her death, and shortly after he qualified as administrator and as receiver for the real estate. On September 10, 1937, the plaintiffs, consisting of fifteen grand and great-grandchildren, filed their petition in this action. In division one thereof they asked for judgment of $12,000 and interest on the note and mortgage assigned to the defendant. In division two, they asked judgment for $11,533.55 for money alleged to have been wrongfully withdrawn from her bank deposits and from rentals. In division three, they asked that the conveyance of the home be set aside. In division four they asked that if the relief granted in the first three divisions be denied, the

property received by the defendant be adjudged to have been advancements, and that the amounts thereof be deducted from any share which the defendant might have in his mother's estate. The basis of all of the divisions was the mental incompetence of Mrs. Daniel, and the fiduciary relation of herself and the defendant. They further alleged that the alleged signatures of Mrs. Daniel to the assignment and deed were forgeries. The plaintiffs had filed a similar petition on October 30, 1936, after the administrator had refused to bring such action. This action was dismissed by the plaintiffs on August 10, 1937, and the present action was brought.

In their answer the defendants admitted the assignment of the mortgage papers and alleged that they were transferred for a valid and valuable consideration; admitted the conveyance of the home as a voluntary gift; alleged that all claims were barred by the statute of limitations; alleged that plaintiffs were guilty of laches; alleged that Ada O. Daniel was at all times of sound mind and that the transfers were of her own free will; alleged that the administrator alone could maintain the action; and that there had been an adjudication of all the causes of action alleged in the petition, because all of said matters were either alleged or could have been in the answer, which the plaintiffs in this action, as defendants, filed in a suit brought by J. E. Daniel to partition the farm land. All other allegations were denied.

The partition action was brought, by Daniel, in May 1936, against all of the parties, who are plaintiffs in this action, asking the partition of the farm land, and alleging the interest of each of the parties therein. The defendants therein pleaded affirmative defenses, the nature of which are not definitely shown in the record. Although the trial court, in its findings and opinion preliminary to its decree, in this action, states that "everyone of the things that are now raised in this action were set up in the answer in the partition proceeding."

Whatever these affirmative defenses were, they were all withdrawn by the defendants in the partition action, and decree was entered therein as prayed, and establishing the interest of J. E. Daniel in the farm land, as an individual one fourth thereof.

The controlling issues in this case are those of fact. One of these is the mental capacity of Ada O. Daniel. The ap-

pellants alleged her mental incompetency, and introduced some evidence in support of the allegation, but have not particularly stressed it in argument, except as an element of the alleged fiduciary relation between the defendant and his mother. The appellants offered no expert testimony on this issue. A number of their lay witnesses, on this issue, were incompetent under section 11257 of the Iowa Code. None of them offered a fact basis for the opinion given that was at all strong.

Mrs. Isabel Smith, who worked in the Daniel home for about a year in 1928, was the best witness for the appellants on this issue. She testified: That Mrs. Daniel was away from the home but twice while she was there, but was up and about the house and yard; that she never saw her write or do any business; that she noticed some peculiarities about her actions and mind, and that she was quite odd in her ways, "like any old person"; that "I observed her mind was failing her"; that she was not competent to do business; that she would get mixed up and forget; that sometimes she would remember people when they came in, and sometimes she would not, "but she would know them in a little while"; "I thought she was just like any old lady, and she was failing; when some one called she would sometimes go to the door, and sometimes I would go; she had little sick spells but they didn't last long; when she talked to me sometimes she was pretty badly confused, and part of the time worried, but she never told me of her troubles." She testified that in the presidential election in 1928 she saw her mark her ballot, when it was brought to the home.

The only other competent witness offered by the appellants on this issue was Mrs. Cora Robbins, the stepmother of the appellant, P. W. Robbins. She had known the deceased intimately for forty years, and during the last twenty years of her life, she spent much time in her company. Usually on each visit she would spend a day or a half day. If the witness did not call, Mrs. Daniel would telephone her. From this it would appear that Mrs. Daniel was good company, and yet the witness testified that, commencing ten years before her death, "she got so she was very forgetful, and couldn't remember anything, and she finally got so she didn't even recognize me when I went there. I expect it has been ten years ago when I first began to notice that she didn't recognize me. * * * In 1928 which was eight years before she died, I would say she wasn't mentally compe-

tent to transact business at that time. I think she continued growing worse from that time on up to the time she died, because each time I could see she was more feeble in mind and body both. She could walk around, and talked, but she got so her sight was very poor. In 1933 I certainly would not say that she was intellectually competent to transact business at that time." George Schmitt, a witness for appellants testified that he had known Mrs. Daniel for many years, and that "she was capable of visiting with people and going about seeing people and tending to her own business. I have never seen anything wrong about her mind while I knew her."

A. D. Simmons, another witness of the appellants, had known Mrs. Daniel as a patron of his bank for thirty years, and saw her in the bank occasionally. Sometimes at her request and at other times at his own desire he called upon her at her home on business matters. He testified: "I think she was a lady who understood my explanations and had mental capacity to understand about business and things that I explained to her. I saw no change in her condition as long as my visits continued there. She was a lady capable of managing and understanding her own business affairs. I don't think she was a woman that would be easily influenced by outsiders, or others; she exercised an independent will concerning business affairs, and I would say that her condition and mental capacity continued up and until at least December 1930."

For the defendant, Dr. Stroy testified that he was acquainted with Mrs. Daniel and had treated her as a patient, on December 29, 1931, and August 28, 1933, for colds in her respiratory organs. He said: "I examined her and talked to her and questioned her as I would any other patient. There wasn't anything to indicate that her condition was other than normal so far as I could see. I would say to the court that both times I served her, for a lady of her age, she was mentally well preserved. I saw nothing at all that would indicate that she wasn't of good mentality. My impression was she was perfectly competent and had a mind of her own. * * * I naturally would be in a position to judge as to whether her answers were fair or rational. There was no question raised at that time with me or by anybody as to her mental condition, nor was it brought to my attention in any way incidentally."

Dr. W. F. Dean, a practicing physician in Osceola for thirty two years, testifying for defendant, said:

"I was acquainted with Ada O. Daniel during her lifetime. I treated her as a patient, at different times, and I was attending her at the time of her death. The mental condition of Ada O. Daniel during the period of time from 1928 up until the time of her death was the average mental condition of any person of her age. She looked after her own business affairs. She wasn't particularly easily influenced. She was rather a strong minded woman, kind of wanted her own way about things and had them usually. In the last two or three days of her life she was sick, and she would be a little delirious at times, but her mental condition was the average mental condition of a good strong minded person up to that time. She died sometime in 1936. I have been the medical member of the Commission of Insanity for Clarke County for twenty years, and I occupy that position at the present time." He testified that he had attended her professionally, mostly for digestive ailments, eleven times in 1928, five times in 1929, two times in 1931, two times in 1932, once in 1935, and seven times in May, 1936, the month of her death. During her last illness she was suffering from uremia, weak heart, and chronic nephritis.

Other old neighbors, who saw her about her home and visited with her during the last ten years of her life and before that period, testified that she had normal possession of her mental faculties at all times, and that they observed nothing wrong or unusual in that respect. It is true that she reached an age much beyond that usually attained, and that she had the physical ailments incident to those years. No doubt she was not as alert mentally as in earlier years, and her memory was not as retentive nor as subject to impression, as it once was. But it requires greater mental retrogression than this to deprive old persons of the right to dispose of their property, as their judgment and their feelings dictate. Mrs. Daniel had many relatives, with most of whom she had little contact. That was true of most of the appellants. Jerry Daniel was her only surviving child. He had given his personal attention to her. She reciprocated as she was able. Every night she went into his bedroom to turn down the covers on his bed. He was still her boy. It is neither strange, nor unnatural, nor evidence of

686

mental incompetency, that she preferred him, in the disposition of her property. It is our judgment that the appellants have failed to establish her mental incapacity.

II. The appellants insist that there was a fiduciary or a confidential relation existing between the mother and son, and that because of her physical and mental weakness, and his stronger personality, he dominated her in the transactions in question, and in all business and property matters. Mrs. Daniel, very naturally, could not give her personal attention to many of the matters connected with the operation of the farm land by tenants. The defendant did these things for her. She could not be in personal contact with many of these matters, and much was necessarily left to his discretion. But there is competent testimony that the tenants consulted with her and she would give general directions to them. The physical labor about the home was performed by the defendant or others. The defendant bought the groceries, and they apparently were paid for when bought. The appellants brought into court the books and records of the Simmons bank, showing many debit and credit entries in her account. A large number of checks were drawn against her account, and frequent deposits were placed in this account. Appellants' witnesses, who had been employed in the bank, or who were merchants about town, had no knowledge or recollection as to who signed her name to these checks. They were not always in the same handwriting. Appellants cross-examined the defendant fully on this matter. He admitted making purchases about town and paying for them by checks on her account. Of the approximately four hundred and fifty checks referred to at the trial, he said that he had not signed very many. Appellants in argument urge that beginning with 1924 $20,542.68 was deposited in her bank account, and that of this amount the defendant had misappropriated approximately $12,000. The record does not sustain this. Of this money $12,000 was loaned to the Switzers. When the bank closed in December 1930, she had $7,000 on time and demand deposit in the bank. The necessary household expenses would readily account for other withdrawals. Whether any dividends were paid on her claims against the closed bank does not appear. There is no evidence that Mrs. Daniel ever complained to the bank about withdrawals from her account . We are satisfied

that the appellants are not entitled to recover under division two of their petition.

■ III. Division one of their petition is based upon the alleged wrongful procuring of the $12,000 Switzer note and mortgage. This note and mortgage bear date of March 1, 1926. The maturity was March 1, 1931. On the back of the note is the following indorsement:

"March 14, 1928

"For value received I hereby assign the within note to Jerry E. Daniel without recourse.

"(signed)        Ada O. Daniel."

The indorsement is in longhand and written in ink. There is no evidence disputing the fact that it is the handwriting of W. N. Temple, a lawyer who practiced at Osceola, until his death in 1934. He had been attorney for Mrs. Daniel. The assignment of the mortgage is on a printed form, with the blanks filled by typewriting. It bears the name, Ada O. Daniel, and the date of March 14, 1926. The acknowledgment was taken by W. N. Temple. The instrument was filed for record on the date it bears. There is no evidence disputing testimony that the typewriting was made on a typewriter in Temple's office. The appellants urge that the name, Ada O. Daniel, was not written by her, on either instrument. They offer no proof of their contention, other than the testimony of Mrs. P. W. Robbins, the wife of one of the appellants. We have before us the admitted signature of Mrs. Daniel made in 1920, 1922, 1923 and 1924, and also enlarged photographs of the disputed signatures. We detect nothing to indicate that the questioned signatures are not the genuine signatures of Mrs. Daniel. The defendant testified that the note and the assignment were delivered to him by W. N. Temple, who had had the assignment recorded before delivering it to him. The defendant admitted that he had collected the note and settled with the Switzers. The appellants have failed to sustain the allegations and claim for relief in division one and division three of their petition.

■ IV. In division four of their petition, the appellants ask that the deed conveying the home to defendant be set aside. The direct proof of the validity of this transfer depends almost entirely upon the testimony of O. M. Slaymaker. His testimony has been viciously attacked by counsel for the appellants. He

has been prominent in the practice of law for over thirty years, with his office at Osceola during all of that time. He knew the Daniel family very well, but had done little if any work for Mrs. Daniel, before this occasion. Mr. Slaymaker was one of the attorneys for J. E. Daniel in the partition action. He was one of the attorneys for the administrator. He appeared as one of the attorneys for the defendants in the earlier action brought by the appellants, and which they dismissed. His name is signed individually to the answer of Daniel in this case, although he did not participate in the trial below or in the oral submission in this court. He testified that the attorney trying the case for the defendants was not a member of his firm, and that they were all in the same office together. Because of these circumstances, and the relation of Mr. Slaymaker to the matters involved, and the importance of his testimony, we have given his testimony most careful and critical consideration.

He testified: That a son of the defendant came to his office on January 23, 1933, and told him that Mrs. Ada O. Daniel wished him to come to her home; that she met him at the door as he called, and told him that she wished to sign some papers before him; that she brought to him a deed, fully prepared, but unsigned, conveying her home in Osceola to the defendant; that she told him Will Temple had prepared it for her; that the deed bore the same date as the assignment of the mortgage —March 14, 1928; that upon his inquiring what the defendant was giving her for the property, she said:

" 'He has been with me here a number of years and looked after me and taken care of me and he has been good to me,' and she says, 'I am turning it to him for the things he has done for me.' I said, 'Is this to be taken out of his share of the estate?' and she says, 'It isn't.' Then I said, 'Here some four or five years ago you assigned to him this Switzer mortgage of $12,000.00 out there.' I said, 'What about that, is that to be taken out of his share of the estate?' and she said, 'It is not.' She says, 'I gave that to him for the same reason I am giving this, that he has been very kind to me and looked after me for a number of years and there was nobody else to do it.' He was the only living child that she had at that time. She signed the deed there in my presence that day. That is her genuine signature on the deed. She not only signed it but she went to her

desk and she got the pen and ink and she brought it out there and she signed it on a table that was right there in the room. I would say it was a dining room table, and I said to her, 'You are signing this deed for the purpose of transferring this property to Jerry?' and she said, 'Yes.' I said, 'It is your voluntary act and deed', and she said, 'Yes.' I said, 'What do you want me to do with it?' and about that time or the time before we got through, Jerry came in and she said, 'I want it given to him', and I brought it on down to the office and here at the office we changed the dates so as to be the date that I was there, and I put my name and seal on it and gave it to Jerry. He was not there at the house any time before the time I was telling you he came in while she was telling me these things. I had not seen him there that morning. I saw her granddaughter-in-law back in the kitchen, it was open there and I could see her going back and forth about her work, but she didn't come out in the room where we were.'' The witness said he was there for twenty minutes or a half hour, during which time she discussed what property she had both in farm lands, and what money she had in the bank when it closed. He said her mind was clear, and he could see nothing wrong with her.

To our minds there was nothing strange about the inquiries which were made to her. They were about matters concerning which any lawyer would have been likely to inquire when on such a mission. No one disputes his being there. The deed was kept in his office for some months and was recorded on May 16, 1933. While the connection of the witness calls for careful scrutiny of the transaction, we find no basis for the aspersions cast upon O. M. Slaymaker or his testimony. Certain unimpeachable circumstances refute these animadversions. This deed has been certified to us. Mr. Slaymaker testified that he took the deed to his office and changed the date and the acknowledgment. These changes clearly appear. We have compared the typewriting in the deed, which was signed January 23, 1933, with the typewriting in the assignment, which was prepared *and recorded* on March 14, 1928. As we have stated it definitely appears that the latter was prepared in Temple's office. It requires but a cursory examination with the careless eye of a non-expert, in matters of typewriting, to fully convince this court that the deed was prepared at the same time, on the same type-

writer, and with same ribbon, used in the preparation of the assignment. This establishes definitely that Mr. Slaymaker had nothing to do with the preparation of the deed, but that Mrs. Daniel had it prepared almost five years before, but delayed its execution and delivery, and called in Mr. Slaymaker simply to witness her signature and take her acknowledgment.

It is our judgment that there was no fiduciary or confidential relation between the defendant and his mother at any time. It is our further judgment that if any such relation existed, the defendant has established by testimony, of the weight and character necessary in such cases, that whatever property he received from his mother, was by her voluntary and intelligent act, and without duress, dominance or overreaching on his part.

V. There remains the contention of the appellants, as alleged in the fifth division of their petition, that whatever property the defendant received was by way of advancement, and should be deducted from his share of the estate. This was an affirmative defense which could and should have been raised in the partition action. There are statements in the record that the appellants did plead advancement as a defense in that action. But whether this is true or not such defense could have been there adjudicated. That issue is res adjudicata so far as this case is concerned. Most of the claims of the appellants were barred by the statute of limitations, but we have felt that the case should be decided on its merits, and we have done so. We have not considered appellee's motion to dismiss the appeal.

It is our judgment that the judgment and decree of the trial court should be and it is affirmed.—Affirmed.

MITCHELL, C. J., and RICHARDS, SAGER, OLIVER, MILLER, and STIGER, JJ., concur.